UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARK GIZEWSKI,

                      Plaintiff,

v.                                                                9:14-CV-0124
                                                                  (GTS/RFT)
NEW YORK STATE DEP'T OF CORR. AND
CMTY. SUPERVISION; MICHAEL SHEAHAN,
Superintendent, Five Points Corr. Facility;
JOHN DOE 1, Treating Physician, Five Points
Corr. Facility; and JOHN DOE 2, Corr. Officer,
Five Points Corr. Facility,

                      Defendants.
_____

APPEARANCES:                                     OF COUNSEL:

LEVINE & BLIT, PLLC                           MATTHEW J. BLIT, ESQ.
  Counsel for Plaintiff                               LEWIS G. SPICER, ESQ.
350 Fifth Avenue, Suite 6902                  JUSTIN S. CLARK, ESQ.
New York, NY 10118

HON. ERIC T. SCHNEIDERMAN            CHRISTOPHER W. HALL, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

       Currently pending before the Court, in this prisoner civil rights action filed by Mark Gizewski ("Plaintiff") against the New York State Department of Corrections and Community Supervision ("DOCCS") and three of its correctional employees (collectively "Defendants"), is Plaintiff's motion for a preliminary injunction pursuant to Fed. R. Civ. P. 65. (Dkt. No. 16.) For the reasons set forth below, Plaintiff's motion is denied.

## I.  RELEVANT BACKGROUND

### A.  Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint alleges that, for various periods of time between approximately May of 2012 and approximately January 6, 2014, at Five Points Correctional Facility ("C.F.") in Seneca County, New York, Defendants denied Plaintiff, *inter alia*, prescription pain medication (for which he had previously been regularly prescribed), a light-weight wheelchair, long-handled shower brushes, and shower upon request (to clean himself after defecating), despite the numerous disabilities he suffers due to his thalidomide-related birth defects, and despite his requests for accommodations. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) In addition, between approximately January 6, 2012, and the date of the Complaint (January 31, 2014, 2014), at Walsh Medical Center in Mohawk C.F. in Oneida County, New York, facility employees denied Plaintiff adequate pain medication and wheelchair ramps, access to the prison yard, and participation in the facility's horticulture program. (*Id.*)

Generally, based on these factual allegations, Plaintiff asserts four claims: (1) a claim that Defendants discriminated against him based upon his disabilities in violation of Title II of the Americans with Disabilities Act ("ADA"); (2) a claim that Defendants failed to provide him reasonable accommodations for his disabilities in violation of Title II of the ADA; (3) a claim that Defendants provided him inadequate medical care under the Eighth Amendment; and (4) a claim that Defendants retaliated against him for engaging in protected activity, in violation of Title II of the ADA. (*Id.*)

Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.

      **B.**      **Parties' Briefing on Plaintiff's Motion**

           **1.**      **Plaintiff's Motion**

Plaintiff filed his motion for a preliminary injunction on July 24, 2014.  (Dkt. No. 16.)  In his motion, Plaintiff requests the following six forms of relief: (1) an Order permitting him the opportunity to shower upon request, (2) an Order permitting him a light-weight or electric wheelchair, (3) an Order permitting him a sufficiently long cleaning brush, (4) an Order permitting him narcotic pain-management medication, (5) an Order preventing him from being transferred back to Five Points C.F., and (6) an Order requiring his transfer to a facility that allows for treatment of his thalidomide-related disabilities.  (Dkt. No. 16, at 2 [attaching page "2" of Plf.'s Proposed Order to Show Cause]; Dkt. No. 16, Attach. 9, at 5 [attaching page "2" of Plf.'s Memo. of Law].)

Generally, in support of this request, Plaintiff argues that he will likely suffer irreparable harm, if his motion is denied, because (1) the inability to clean himself after defecating will "expos[e] him to serious infection and constant pain" that "will prove life-threatening," (2) the deprivation of a light-weight or electric wheelchair will cause him "immobility," and (3) the deprivation of adequate pain medication will cause him "severe pain throughout his body."  (Dkt. No. 16, Attach. 9, at 8-9 [attaching pages "5" and "6" of Plf.'s Memo. of Law].)

In addition, Plaintiff argues that he will likely succeed on the merits of his claims for the following reasons: (1) with regard to his reasonable-accommodation claim under the ADA, he is a qualified individual with a disability, he was denied the benefits of adequate personal-hygiene services and equipment because of his disability, and the prison is a public entity; (2) with regard to his deliberate-indifference claim under the Eighth Amendment, his medical needs are

objectively serious (in that his inability to properly clean himself after defecating put him at risk for a potentially life-threatening infection), and Defendants have acted with a sufficiently culpable state of mind (in that they have been aware of his medical conditions and its associated risks for a lengthy period of time); and (3) with regard to his retaliation claim under the ADA, Plaintiff engaged in protected activity (by making multiple requests for reasonable accommodations for his disability), he was subjected to adverse action (by being denied adequate medical services and being physically assaulted by a corrections officer), and the former caused the latter (as evidenced by the "continuing and escalating animus" against him). (*Id*. at 9-12 [attaching pages "6" through "9" of Plf.'s Memo. of Law].)

Alternatively, Plaintiff argues that he has shown a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in its favor, because (1) his health and potentially his life are at stake, (2) the accommodations he seeks would not cause a substantial hardship to Defendants, and (3) "inmate are members of the public who are afforded the same protections as those outside of prison." (*Id*. at 12-13 [attaching pages "9" and "10" of Plf.'s Memo. of Law].)

### 2.     Defendants' Response

Generally, in response to this request, Defendants argue that Plaintiff's request for injunctive relief is moot under *Salahuddin v. Goord*, 467 F.3d 236, 272 (2d Cir. 2006), for the following two reasons: (1) the day after Plaintiff informed Defendants that he was filing his motion, DOCCS transferred him from Mohawk C.F. to Shawangunk C.F., where Plaintiff is housed in the infirmary (and there is a "wheelchair housing block for inmates with appropriate needs"); and (2) because of the transfer, the individuals alleged to have caused his inadequate

prison conditions (i.e., the employees of Five Points C.F.) are no longer responsible for the conditions under which Plaintiff is incarcerated.  (Dkt. No. 18 [Defs.' Opp'n Memo. of Law]; Dkt. No. 18, Attach. 1 [Affirm. of Christopher Hall].)

### 3. Plaintiff's Reply

Generally, in reply to Defendants' response, Plaintiff asserts three arguments.  (Dkt. No. 20.)  First, argues Plaintiff, his transfer to Shawangunk C.F. does not moot his request for injunctive relief for two reasons: (a) he has sued not only individuals at Five Points C.F. but also DOCCS (which is responsible for the conditions of his confinement); and (b) in any event, Defendants have adduced only a vague attorney affidavit in their effort to show that Shawangunk C.F. provides the forms of relief he requests.  (*Id*. at 4-7 [attaching pages "2" through "5" of Plf.'s Reply Memo. of Law].)  Plaintiff argues that Shawangunk C.F. is a "harsher" facility–a maximum security one that is less equipped to address his disabilities.  (*Id*.)  Plaintiff notes also that there is no assurance that his incarceration at Shawangunk C.F. is permanent; he may be transferred to a place like Mohawk C.F. or Five Points C.F. at any time (as evidenced by the fact that he has previously been transferred).  (*Id*.)

Second, argues Plaintiff, his motion falls under the exception for cases capable of repetition yet evading review for two reasons: (a) he has experienced bad conditions at two of the three facilities at which he has now been incarcerated (i.e., Five Points C.F. and Mohawk C.F.); and (b) harm may again be inflicted on him at will by DOCCS and then ceased immediately (i,e., one day after he files a motion), thus "mooting" another motion.  (*Id*. at 4-6 [attaching pages "2" through "4" of Defs.' Opp'n Memo. of Law].)

5

Third, argues Plaintiff, "principles of equity and fundamental fairness" also support a finding that Plaintiff's request for injunction relief is not moot, because DOCCS' sudden transfer of Plaintiff to "a harsher facility less equipped to adequately treat his disabilities" was obviously in bad faith. (*Id*. at 6-7 [attaching pages "4" and "5" of Defs.' Opp'n Memo. of Law].)

### C.    Evidentiary Hearing

On September 29, 2014, the Court conducted a three-and-a-half-hour evidentiary hearing on Plaintiff's motion. (Dkt. No. 27.) At the hearing, testifying for Plaintiff, and cross-examined by Defendants, were the following witnesses: (1) Plaintiff; (2) Dr. Chaim Y. Mandelbaum, M.D.; and (3) Dr. Martin W. Johnson, Ph.D. (*Id*.) Testifying for Defendant, and cross-examined by Plaintiff, was Dr. Chung S. Lee, M.D. (*Id*.) Plaintiff adduced Exhibits P-1 through P-32, and Defendants adduced Exhibit D-1. (Dkt. Nos. 28, 29.) At the end of the hearing, the Court reserved decision and indicated a written decision would follow. (Dkt. No. 27.) This is that written decision.

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motion for Preliminary Injunction

Generally, the issuance of a preliminary injunction pursuant to Fed. R. Civ. P. 65 depends on the movant's demonstration of (1) irreparable harm and (2) either (i) a likelihood of success on the merits or (ii) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995). However, a "movant [must] . . . meet a higher standard where[] (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought

and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assoc., Inc.*, 60 F.3d at 33-34.  Pursuant to that higher standard, the injunction shall issue "only upon a clear [or substantial] showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id*. at 34.

      **B.**     **Legal Standards Governing Plaintiff's Claims**

Because the parties have (in their memoranda of law) demonstrated an adequate understanding of the legal standards governing Plaintiff's claims, the Court need not, and does not, recite those legal standards in this Decision and Order, which is intended primarily for the review of the parties.

**III.**    **ANALYSIS**

      **A.**     **Whether to Issue an Order Permitting Plaintiff the Opportunity to Shower Upon Request**

According to the evidence adduced at the hearing, since approximately July 30, 2014, Plaintiff has had the opportunity to shower upon request at Shawangunk C.F. between 7:00 a.m. and approximately 9:45 p.m.  (Hrg. Tr. at 15-16, 28, 30.)[1]  The only time he cannot shower is from approximately 9:45 p.m. to 7:00 a.m.  (*Id*. at 17.)  The reasons for this restriction appear to include the following: (1) the fact that the jail "locks down" at 10:00 p.m., (2) the need to count the inmates for security purposes, and (3) the fact that one or more shift changes occur during that time period (during which staff is particularly busy).  (*Id*. at 16, 97.)  Between

---

[1] While this ability is the result of a medical pass that has to be renewed every one to twelve months due to DOCCS policy and the fact that Plaintiff's condition may change or he may be transferred (*see, e.g.,* Hrg. Tr. at 30, 77-78, 93-95), insufficient evidence was adduced to establish that the pass will *not* likely be renewed in the future.

approximately July 30, 2014, and the date of the hearing (September 29, 2014), Plaintiff had to make a bowel movement between 10:00 p.m. and 7:00 a.m. only "a couple of times," most recently a "few days" before the hearing. (*Id*. at 17, 97.) However, having to wait to clean himself in the shower caused no "sores" on his rectum, only "irritation." (*Id*. at 18.)

After carefully considering the matter, the Court finds that Plaintiff has not shown that a denial of the Order he seeks with regard to unlimited shower access will cause him irreparable harm. Granted, Dr. Lee acknowledged that it is "medically necessary" for Plaintiff to be able to access a shower 24 hours a day, seven days a week. (*Id*. at 97.) Ordinarily, the deprivation of such a medical necessity may well result in irreparable harm. However, here, the *reason* that such access is medically necessary is to avoid skin irritations (and *possible* sores) "a couple of times" every 60 days. (*Id*. at 17-18, 97.) While such skin irritations (and speculative sores) may be both uncomfortable and avoidable, they appear (based on the evidence before the Court) to be relatively infrequent, minor and temporary in nature.

Certainly, the infrequency of a denial is a factor in determining whether the denial amounts to an irreparable harm. For example, Dr. Lee would doubtlessly opine that exercise is also a medical necessity for Plaintiff. (*See, e.g., id.* at 84-86.) However, the Court would have trouble finding that an infrequent denial of such exercise amounts to an irreparable harm. *Cf. Young v. Ballis*, 762 F. Supp. 823, 833 (S.D. Ind. 1990) (holding that the availability of only infrequent opportunities to exercise does not amount to irreparable harm). More importantly, district courts have held that harms that are relatively minor and temporary in nature are not irreparable. *See, e.g., Bellamy v. Mount Vernon Hosp.*, 07-CV-1801, 2009 WL 1835939, at *7 (S.D.N.Y. June 26, 2009) ("Headaches and fatigue do not rise to the level of seriousness

8

necessary to warrant a preliminary injunction . . . ."). Of particular significance is the fact that Plaintiff did not adduce evidence that the irritations and/or sores were either life threatening or accompanied by significant pain. (*See generally* Hrg. Tr.) *See also Nixon v. Penner*, 03-CV-2583, 2006 WL 2385184, at *6 (E.D. Cal. Aug. 17, 2006) (finding that fungal and bacterial infection in plaintiff's foot did not constitute irreparable harm because plaintiff provided no evidence that it was either life threatening or accompanied by significant pain).

### B. Whether to Issue an Order Permitting Plaintiff a Light-Weight or Electric Wheelchair

According to the evidence adduced at the hearing, since approximately July 30, 2014, Plaintiff has had a wheelchair at Shawangunk C.F. (Hrg. Tr. at 29.)[2] Although his arms are too short to reach the wheels, he can move himself forward and backward in the wheelchair with his only leg, albeit with some effort. (*Id*. at 21-22, 69, 99.) In addition, he can pull himself out of the wheelchair with effort, and walk with his prosthetic leg on a limited basis. (*Id*. at 14, 25-26, 48, 60, 74.) Finally, he has a "mobility assistant" who is available to push his wheelchair for him 24 hours per day, seven days per week. (*Id*. at 26, 33.)[3]

After carefully considering the matter, the Court finds that Plaintiff has not shown that a denial of the Order he seeks with regard to the light-weight or electric wheelchair will cause him irreparable harm. Nor has he shown a likelihood of success on the merits of this particular claim

---

[2] No evidence was adduced regarding the relative lightness or heaviness of the wheelchair. (*See generally* Hrg. Tr.)

[3] While the wheelchair and mobility assistant (as well as the prosthetic leg) are the result of medical passes that have to be renewed every one to twelve months due to DOCCS policy and the fact that Plaintiff's condition may change or he may be transferred (*see, e.g.,* Hrg. Tr. at 26, 27, 29, 71-72, 77-78, 93-95), insufficient evidence was adduced to establish that the passes will *not* likely be renewed in the future.

(or a sufficiently serious question as to the merits of it to make it a fair ground for litigation and a balance of hardships tipping decidedly in his favor), given his care at Shawangunk C.F. since approximately July 30, 2014.

Granted, in the opinion of Dr. Mandelbaum, in the "ideal world" the best means of transportation for Plaintiff would be an electric wheelchair. (*Id*. at 22, 48, 53.) However, the "ideal world" is not the legal standard by which the adequacy of the medical care of inmates at correctional facilities is measured under the Eighth Amendment.[4] More importantly, in the opinion of Dr. Lee, Plaintiff does not need an electric wheelchair but a mobility assistant, because such an assistant is necessary to open doors by hand (such as the doors between his cell and the infirmary, and the door to the yard), and Plaintiff would be unable to open such doors if he were by himself in an electric wheelchair. (*Id*. at 72, 99, 100.) While Plaintiff's counsel appeared to argue (at the hearing) that Plaintiff needs *both* an electric wheelchair and someone standing by at all times to open doors for him (*id*. at 100), Plaintiff did not establish a medical necessity for such accommodations (*id*. at 33, 100-02). Furthermore, while Plaintiff asserted that his use of one leg to move his wheelchair exacerbates his scoliosis and hurts his hip and leg (*see, e.g.*, *id*. at 21-22, 49-50, 79-80, 98-101; Ex. P-16), he did not explain why a mobility assistant

---

[4] *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) ("It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[] understandably seeks . . . . We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. . . . The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . . .").

would not obviate his need to use his leg to move his wheelchair, nor did he even persuade the Court that his use of his leg to move his wheelchair would necessarily exacerbate his scoliosis or hurt his hip and leg, especially given the testimony of Dr. Lee on the subject (Hrg. Tr. at 79-80, 99-101).

      C.     **Whether to Issue an Order Permitting Plaintiff a Sufficiently Long Cleaning Brush**

According to the evidence adduced at the hearing, since approximately July 30, 2014, Plaintiff has had two long-handled scrub brushes to clean his anal area in the shower at Shawangunk C.F. (Hrg. Tr. at 16, 17, 28, 62, 76, 94-96.)[5] Plaintiff did not adduce evidence that the brushes were not sufficiently long. (*See generally* Hrg. Tr.; Hrg. Exs. P-1 through P-32.)

After carefully considering the matter, the Court finds that Plaintiff has not shown that a denial of the Order he seeks with regard to the sufficiently long cleaning brush will cause him irreparable harm. Nor has he shown a likelihood of success on the merits of this particular claim (or a sufficiently serious question as to the merits of it to make it a fair ground for litigation and a balance of hardships tipping decidedly in his favor), given his care at Shawangunk C.F. since approximately July 30, 2014.

      D.     **Whether to Issue An Order Permitting Plaintiff Narcotic Pain-Management Medication**

According to the evidence adduced at the hearing, since approximately August 5, 2014, Plaintiff has been receiving Percocet three times a day: once at 8:30 a.m., once between 12:00

---

[5] While this cleaning brush is the result of a medical pass that has to be renewed every one to twelve months due to DOCCS policy and the fact that Plaintiff's condition may change or he may be transferred (*see, e.g.,* Hrg. Tr. at 28, 77-78, 93-95), insufficient evidence was adduced to establish that the pass will *not* likely be renewed in the future.

and 12:30 p.m., and once between 9:00 and 9:30 p.m. (Hrg. Tr. at 16, 18, 36, 39, 64, 66.) Each dose of Percocet contains 5 milligrams of oxycodone and 325 milligrams of acetaminophen. (*Id*. at 40, 66.) Oxycodone is a non-sustained-release medication that typically lasts approximately three or four hours in a patient, depending on such things as his metabolism and tolerance to the medication. (*Id*. at 36, 39-40, 87.) Instead, Plaintiff wants a higher dosage of a sustained-release medication (i.e., one that typically lasts between eight and 12 hours)–such as 30 to 60 milligrams of MS Contin taken three or four times per day, or an unspecified dosage of Oxycontin taken an unspecified number of times per day, or a morphine patch that lasts three days. (*Id*. at 5-6, 35-37, 39, 86, 91-92.)

At the hearing, Plaintiff adduced the opinion of Dr. Mandelbaum (who has a Board subcertification in pain medicine, graduated from medical school in 1992, and last saw Plaintiff on January 23, 2009). (*Id*. at 34-35.) Dr. Mandebaum opined that a sustained-release medication would "probably" be "better" Percocet for Plaintiff for essentially two reasons. (*Id*. at 36-39.)

First, opined Dr. Mandelabum, Plaintiff has significant reason to have pain given his musculoskeletal defects; and, because he will have those defects for the rest of his life, his condition is chronic. (*Id*.) Second, opined Dr. Mandelbaum, the fewer "peaks and troughs" that are created by sustained-release medication would reduce the number of times that pain reappeared between doses. (*Id*.)

Defendant, on the other hand, adduced the testimony of Dr. Lee (the Health Services Director of Shawangun C.F., who graduated from medical school in 1974, has specialized training in anatomical and clinical pathology, has attended conferences in pain management, and

12

last seen Plaintiff on September 26, 2014). (*Id*. at 56, 73.)  Dr. Lee opined that Percocet is more reasonable than MS Contin for Plaintiff at the present time essentially for four reasons. (*Id*. at 73-74, 83.)

First, opined Dr. Lee, while Plaintiff has numerous birth defects, those birth defects usually do not in and of themselves cause significant pain, in his experience; and, even if they do, the pain may be reduced through such things as physical therapy, exercise and correct posture. (*Id*. at 61, 66-67, 78, 85-86, 89.)  Second, opined Dr. Lee, while a physical therapist has received some complaints of pain from Plaintiff since he started taking the Percocet, the medical staff at Shawagunk C.F. has not received such complaints. (*Id*. at 64, 69, 73, 74, 76, 89-90.)  To the contrary, Dr. Lee has been told by Plaintiff that his pain is manageable. (*Id*. at 65, 87.) Third, opined Dr. Lee, he has not observed objective symptoms of pain in Plaintiff since he started taking the Percocet, e.g., facial expressions such as frowning, tearing of the eyes, and bodily gestures. (*Id*. at 65, 77, 82.)  Fourth, opined Dr. Lee, Plaintiff can become addicted if he takes more than 30 milligrams of oxycontine per day for more than one week. (*Id.* at 66.)  It is worth noting that Dr. Mendelbaum agreed that there were "dependency issues" that always need to be dealt with when patients are on an opiate medication for an extended period of time, due to the tolerance they develop to the medication. (*Id*. at 37-39.)

After carefully considering the matter, the Court finds that Plaintiff has not shown that a denial of the Order he seeks with regard to narcotic pain-management medication will cause him irreparable harm.  Nor has he shown a likelihood of success on the merits of this particular claim (or a sufficiently serious question as to the merits of it to make it a fair ground for litigation and a balance of hardships tipping decidedly in his favor), given his care at Shawangunk C.F. since August 5, 2014.

The Court acknowledges that Dr. Lee is not a specialist in either pain medicine or thalidomide-related birth defects.  However, the Court finds his testimony to be persuasive due to the fact that, *inter alia*, (1) he has 18 more years of experience than does Dr. Mandelbaum, (2) he has specialized training in anatomical and clinical pathology and has attended conferences in pain management, (3) he saw Plaintiff numerous times between approximately July 30, 2014, and September 26, 2014, and was able to examine any objective signs of pain, (4) his opinion is based in part on concerns of tolerance and dependency issues, and (5) he expressed a willingness to keep an open mind and re-evaluate Plaintiff's pain-medicine prescription based on his conversations with, and examinations of, Plaintiff (*see, e.g.,* Hrg. Tr. at 91, 101).

Moreover, the Court acknowledges that Dr. Mandelbaum is a pain-medicine specialist. However, the Court finds that the persuasive effect of his testimony was diminished by the fact that (1) he has 18 fewer years of experience than does Dr. Lee, (2) he has not seen Plaintiff since January 23, 2009, (3) he testified only that MS Contin would "probably" be "better" than Percocet, and (4) he expressly acknowledged that tolerance and dependency is an issue.

Finally, the Court finds that, for purposes of this motion, the issue of whether Plaintiff's pain will last a lifetime (and whether his birth defects are "degenerative" or "non-degenerative," meaning they will not worsen over time) is somewhat of a red herring.  Such an issue appears primarily relevant to the number of years that a pain drug will be prescribed, not the type of the drug, the dosage of the drug, or duration of the drug's effects. (If anything, the fact that Plaintiff's pain may last his entire lifetime would appear to weigh in favor of prescribing him pain drugs in a conservative manner, based on the hearing testimony regarding tolerance and addictiveness.)

In sum, given the nature of the testimony adduced by Plaintiff, as well as his demeanor during the hearing, the Court is left with the impression that DOCCS is now reasonably satisfying his pain-medication needs at Shawangunk C.F. (and will continue to do so).

### E. Whether to Issue an Order Preventing Plaintiff from Being Transferred Back to Five Points C.F.

Over the course of approximately 69 months (i.e., January of 2009 to September of 2014), Plaintiff has been transferred within DOCCS eight times: (1) from Downstate C.F. to Franklin C.F.; (2) from Franklin C.F. to Upstate C.F.; (3) from Upstate C.F. to Wyoming C.F.; (4) from Wyoming C.F. to Orleans C.F.; (5) from Orleans back to Wyoming C.F.; (6) from Wyoming C.F. to Five Points C.F.; (7) from Five Points C.F. to Walsh Medical Center at Mohawk C.F.; and (8) from Mohawk C.F. to Shawangunk C.F. (Hrg. Tr. at 5, 7-13.) Each time the transfer occurred without prior notice. (*Id*. at 8-10.)

Plaintiff concludes from these facts that another transfer is imminent. However, the Court concludes from these same facts that another transfer is *not* imminent. Of particular significance to the Court are the following facts: (1) primarily for security purposes, it is highly unlikely for DOCCS to give an inmate advance notice of a transfer;[6] (2) the transfer to Franklin C.F. was merely because Downstate C.F. was a "reception prison," the transfer to Upstate C.F. appears to have been related to a disciplinary conviction, and the transfer to Walsh Medical

---

[6] *See, e.g., Konigsberg v. Lefevre*, 267 F. Supp.2d 255, 261 (N.D.N.Y. 2003) (Munson, J.) ("[N]o due process protections such as notice and hearing need be afforded before a prisoner is transferred even if the transfer is for disciplinary reasons or to a less favorable institution."); N.Y. Corr. Law § 23 ("The commissioner shall have the power to transfer inmates from one correctional facility to another. Whenever the transfer of inmates from one correctional facility to another shall be ordered by the commissioner, the superintendent of the facility from which the inmates are transferred shall take *immediate* steps to make the transfer.") (emphasis added).

Center at Mohawk C.F. was for the purpose of treating an injury to his arm (Hrg. Tr. at 7-8, 10, 12-13); (3) the most-recent transfer occurred rather immediately after Plaintiff exhibited sufficient dissatisfaction with his accommodations and medical care to file the pending motion for a preliminary injunction (*compare* Dkt. No. 16 [filed on July 24, 2014] *with* Hrg. Tr. at 28, 30, 56, 61-62 [testifying that he arrived at Shawangunk C.F. on approximately July 24, 2014]); (4) the correctional facility to which he was transferred, Shawangunk C.F., employs a medical staff that Plaintiff characterizes as "better than any medical staff that I've encountered in my whole entire incarceration (Hrg. Tr. at 24);[7] and (5) rather than expressing a sense of defeat at the prospect of treating Plaintiff's condition, Dr. Lee has indicated a willingness to discuss Plaintiff's medical issues with him, review his recent medical records (i.e., the records from the period during which Dr. Lee was on vacation), review the appropriate pain medicines, and re-evaluate his treatment (*see, e.g., id.* at 81, 89-91, 101).

Moreover, generally, the Court is reluctant to direct DOCCS (which is charged with keeping the people of New York State safe from more than 50,000 convicted felons who are serving their criminal sentences) where to transfer, and not transfer, its inmates. *See, e.g., Theodore v. Coughlin,* 83-CV-6668, 1986 WL 11456, at *3 (S.D.N.Y. October 7, 1986) ("Courts

---

[7] The Court finds that this is no small praise considering that it appears (from DOCCS Inmate Lookup Service) that Plaintiff's "whole entire incarceration" has included three terms of incarceration in DOCCS, the first one having commenced in approximately January of 1993 and included an incarceration at Attica C.F., and the second one having commenced in approximately October of 1995 and included an incarceration at Livingston C.F. *See* NYS DOCCS Inmate Lookup Service, http://nysdoccslookup.doccs.ny.gov/ (last visited Oct. 8, 2014). Indeed, Plaintiff characterizes both the medical staff and correctional officers at Shawangunk C.F. as having "a lot of compassion," and being "pretty decent people," who have "gone out of their way to help me" and have "bent over backwards to try to accommodate my needs." (Hrg. Tr. at 24.)

are reluctant to interfere with prison administration . . . ."); *Davidson v. Kalonick*, 84-CV-6985, 1986 WL 3775, at *3 (S.D.N.Y. March 21, 1986) ("[A]s a general proposition, courts are reluctant to interject themselves into the daily administration of state correctional facilities."); *Savage v. Snow*, 575 F. Supp. 828, 833 (S.D.N.Y.1983) ("Federal courts are, however, reluctant to interfere in matters of prison administration and confinement."); *Negron v. Preiser*, 382 F. Supp. 534, 541 (S.D.N.Y.1974) ("The federal courts are extremely reluctant to interject themselves into the day to day administration of state correctional institutions.").

For all of these reasons, the Court finds that Plaintiff has not shown that a denial of the Order he seeks with regard to a transfer back to Five Points C.F. will cause him irreparable harm.

### F.      Whether to Issue an Order Requiring Plaintiff's Transfer to a Facility that Allows for Treatment of His Thalidomide-Related Disabilities

At the hearing, no evidence was adduced that there exists, within DOCCS, a correctional facility staffed by a physician who specializes in "thalidomide-related disabilities." (*See generally* Hrg. Tr. and Hrg. Exs.)  Nor has Plaintiff established that he has a medical need for treatment by such a specialist at this time. (*Id.*)  According to the credible testimony of Dr. Lee, "hav[ing] thalidomide" (as Plaintiff's counsel calls it) is not Plaintiff's medical condition; rather having birth defects resulting from being exposed to thalidomide (e.g., phocemelia) is his medical condition. (*Id.* at 61, 80.)  Furthermore, those birth defects (which include missing thumbs, missing carpal bones, missing ulna bones, and scoliosis) are within Dr. Lee's areas of understanding. (*See, e.g., id.* at 7, 56, 58-59, 61, 78-81, 83-84.)

The Court notes that, since Plaintiff's arrival at Shawangunk C.F. on approximately July 24, 2014, the medical staff there has regularly seen him. (*See* Hrg. Exs. D-1, P-10, P-11, P-12, P-13, P-21, P-22; Hrg. Tr. 5-33.)  Moreover, since Plaintiff started receiving Percocet on

approximately August 5, 2014, the medical staff at Shawangunk C.F. has not received any complaints of unmanageable pain from him, or observed any signs of unmanageable pain in him. (*See* Hrg. Ex. D-1; Hrg. Tr. at 23, 65, 73.)[8]  Finally, Plaintiff characterizes the care by the medical staff at Shawangunk C.F. as being good.  *See, supra*, Part III.E. of this Decision and Order.

Under the circumstances, the Court is reluctant to interfere with Plaintiff's medical care, or substitute its judgment for that of DOCCS' medical staff.  *See Ross v. Kelly,* 784 F.Supp. 35, 44-45 (W.D.N.Y.) ("Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. . . .  Moreover courts have repeatedly held that a prisoner does not have the right to the treatment of his choice.") (internal citation omitted), *aff'd*, 970 F.2d 896 (2d Cir.1992); *Alvarez v. Goord,* 05-CV-0827, 2010 WL 1965892, at *11 (W.D.N.Y. May 17, 2010) ("Where, as here, the prisoner has received medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgment."); *Davidson v. Kalonick*, 84-CV-6985, 1986 WL 3775, at *3 (S.D.N.Y. March 21, 1986) ("Great deference is paid to medical judgments, with courts reluctant to substitute their judgment for that of DOCS medical personnel."); *Negron v. Preiser*, 382 F. Supp. 534, 541 (S.D.N.Y.1974) ("The courts are even more reluctant to . . . substitute their judgment for that of a physician in medical matters.").

---

[8]  The Court notes that, while Plaintiff reported that he was experiencing pain in his right shoulder, lower-back and hip on September 25, 2014, he also reported that the pain-medication was effective.  (Hrg. Tr. at 73; Hrg. Ex. D-1.)  Moreover, approximately twelve hours later, he reported no complaints of pain.  (*Id.*)

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 16) is

**DENIED**.

Dated: October 10, 2014
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge